**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------X

Massimo Lombardozzi,

                              Plaintiff,

               -against-

Martin O'Malley, Commissioner of Social
Security Administration,[1]

                           Defendant,

Social Security Administration,

                           Interested Party.

----------------------------------------------------------------X

7:23-cv-00073-VR

<u>**OPINION & ORDER**</u>

**VICTORIA REZNIK, United States Magistrate Judge:**

Plaintiff Massimo Lombardozzi brings this action under 42 U.S.C. § 405(g), seeking judicial review of a final determination of the Commissioner of Social Security (Commissioner), which denied his application for supplemental security income.  On January 19, 2023, the parties consented to jurisdiction before a magistrate judge for all purposes, pursuant to 28 U.S.C. § 636(c).  (ECF No. 7 (Consent)).

The parties now cross-move for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure.  (ECF Nos. 9 (Mot.), 14 (Cross-Mot.)).  For the reasons below, Lombardozzi's motion is **DENIED** and the Commissioner's motion is **GRANTED**.

## I.    <span style="font-variant: small-caps;">Background</span>

The facts below are taken from the administrative record of the Social Security Administration, filed by the Commissioner on March 7, 2023.  (ECF Nos. 8, 8-1, 8-2 (SSA

---

[1] Martin O'Malley became the Commissioner on December 20, 2023.  He is substituted for the former Acting Commissioner, Kilolo Kijakazi, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.  The Clerk of Court is respectfully directed to amend the official caption to conform to the above.

Record)).[2]

## A.    Application History

On August 31, 2020, Lombardozzi applied for supplemental security income, alleging that he had been disabled since January 1, 2014.  (ECF No. 8 at 227–49).[3]  As explained below, Lombardozzi alleged disability due to hearing loss, allergic rhinitis,[4] sinusitis,[5] and nasopharyngeal carcinoma.[6]  On December 22, 2020, the Commissioner informed Lombardozzi that his claim had been administratively denied.  (*Id.* at 65–75, 100–10).  On April 24, 2021, the Commissioner denied reconsideration.  (*Id.* at 117–28).

Lombardozzi requested a hearing before an Administrative Law Judge (ALJ).  (*Id.* at 131–34).  On November 16, 2021, ALJ Michael Stacchini held a telephonic hearing.  (*Id.* at 34–64).  At that hearing, Lombardozzi appeared with counsel (*id.* at 38–39), who amended the alleged onset date to August 31, 2020 (*id.* at 41–42).  On July 26, 2022, the ALJ issued a written decision, in which he concluded that Lombardozzi was not disabled within the meaning of the Social Security Act.  (*Id.* at 19–28).  The ALJ concluded that Lombardozzi had severe

[2] The Court conducted a plenary review of the entire administrative record, familiarity with which is presumed.  The Court assumes knowledge of the facts surrounding Lombardozzi's medical history and does not recite them in detail, except as relevant to the analysis set forth in this Opinion and Order.

[3] All page numbers to documents filed on ECF refer to ECF pagination, not the sequential numbering of the SSA Record provided on the bottom right corner of the page.

[4] Allergic rhinitis or "hay fever" causes cold-like symptoms (e.g., runny nose, itchy eyes, congestion, sneezing, and sinus pressure), but is caused by an allergic response to a harmless outdoor or indoor substance that the body identifies as harmful (i.e., allergen, e.g., pollen and dust mites).  *Hay Fever*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/hay-fever/symptoms-causes/syc-20373039 [https://perma.cc/SN8G-TJUV].

[5] Chronic sinusitis occurs when the spaces inside the nose and head (i.e., sinuses) are swollen and inflamed for three months or longer despite treatment.  *Chronic Sinusitis*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/chronic-sinusitis/symptoms-causes/syc-20351661 [https://perma.cc/7APW-A9PA].

[6] Nasopharyngeal carcinoma is a cancer that occurs in the nasopharynx, which is located behind the nose and above the back of the throat.  *Nasopharyngeal Carcinoma*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/nasopharyngeal-carcinoma/symptoms-causes/syc-20375529 [https://perma.cc/C64F-ZPTC].

impairments, consisting of hearing loss, allergic rhinitis, sinusitis, and nasopharyngeal

carcinoma, which limited his ability to perform basic work activities.  (*Id.* at 22).  Even so,

Lombardozzi had the residual functional capacity to perform a full range of work at all exertional

levels, had non-exertional limitations as to exposure to atmospheric conditions, unprotected

heights, and hazardous machinery, and was limited to working conditions that had a moderate

sound/noise level and did not require hearing quiet sounds/whispering.  (*Id.* at 23–26).  The ALJ

relied on a vocational expert's testimony that an individual with Lombardozzi's limitations could

perform the requirements of a hand packager, laundry laborer, and cook's helper.  (*Id.* at 26–27).

Lombardozzi sought review from the Appeals Council (*id.* at 15), who denied his request on

November 4, 2022 (*id.* at 5–7).  This action followed.  (ECF No. 1 (Compl.)).

**B.     Record Before the ALJ**

As described below, the record before the ALJ includes more than nine years of medical

records, treatments, and examinations, stemming from Lombardozzi's several medical ailments.

1.   Lombardozzi's Medical Records

Between September 2012 and December 2021, Lombardozzi received ENT treatment

from Dr. Katrina R. Stidham and other doctors.  In September 2012, Dr. Stidham evaluated

Lombardozzi and diagnosed him with chronic serous otitis media, middle ear conductive hearing

loss, chronic rhinitis, noise-induced hearing loss, and eustachian tube dysfunction.[7]  (ECF No. 8-

---

[7] Eustachian tube dysfunction is the failure of the eustachian tube in maintaining pressure equalization or mucociliary transport and symptoms include aural fullness or "popping sounds," reduced hearing, tinnitus, autophony, otalgia, and imbalance.  *Eustachian Tube Dysfunction*, NAT'L LIBR. MED., https://www.ncbi.nlm.nih.gov/books/NBK555908 [https://perma.cc/APN3-ZRCT].

1 at 167–68).  Dr. Stidham recommended Medrol,[8] Nasonex,[9] and Claritin.[10]  (*Id.* at 168).  In October 2012, Dr. Stidham placed a tympanostomy tube in the left ear.[11]  (ECF No. 8-2 at 62–63).

In November 2012, Dr. Stidham observed that Lombardozzi's auricle appeared normal, without scars, lesions, or masses, and the ear canals were clear without any discharge, cerumen, and inflammation.  (ECF No. 8-1 at 229).  The left tympanum had erythematous.[12]  (*Id.*).  Dr. Stidham recommended Tobradex[13] and performed a culture (*id.*), which returned positive for Candida[14] (ECF No. 8-2 at 58).  Two weeks later, Lombardozzi improved but a nasal examination showed rhinorrhea bilaterally, and Dr. Stidham referred him to an allergist.  (*Id.* at 58–59).

---

[8] Medrol is a brand name for methylprednisolone, which provides relief for inflamed areas of the body and is used to treat a variety of conditions.  *Methylprednisolone (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/methylprednisolone-oral-route/description/drg-20075237 [https://perma.cc/E623-9VET].

[9] Nasonex is a brand name for a mometasone nasal spray, which is used to treat and prevent symptoms of season and perennial allergic rhinitis.  *Mometasone (Nasal Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/mometasone-nasal-route/description/drg-20064895 [https://perma.cc/XXA3-Z4G3].

[10] Claritin is a brand name for Loratadine, which is used to treat allergy symptoms.  *Loratadine (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/loratadine-oral-route/description/drg-20523204 [https://perma.cc/W8KH-LDHX].

[11] A tympanostomy tube is a tiny, hollow tube that is placed into a person's eardrum to make an airway that prevents fluid from building up behind the eardrum.  *Tympanostomy Tubes*, MAYO CLINIC, https://www.mayoclinic.org/tests-procedures/ear-tubes/multimedia/img-20199962 [https://perma.cc/36T4-A676].

[12] Erythematous refers to abnormal redness of the skin or mucous membranes due to inflammation.  *Erythematous*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/erythematous [https://perma.cc/AC7J-VHEY].

[13] Torbadex is a brand name for tobramycin and dexamethasone, a combination of an antibiotic and a corticosteroid, which is normally used to treat certain eye problems.  *Tobramycin and Dexamethasone (Ophthalmic Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/tobramycin-and-dexamethasone-ophthalmic-route/description/drg-20062827 [https://perma.cc/UW4F-HC49].

[14] Candida auris is a fungal infection of the ear.  Suzanne Ferguson, *Candia Auris: This Fungus is a Health Care Concern*, MAYO CLINIC (Apr. 14, 2023), https://newsnetwork.mayoclinic.org/discussion/candida-auris-this-fungus-is-a-health-care-concern [https://perma.cc/JBJ8-9S84].

In December 2012, Dr. Mauli Desai, an allergist, performed an allergy percutaneous,[15] which revealed a dust mite allergy. (ECF No. 8-1 at 140–42). Dr. Desai diagnosed allergic and chronic rhinitis; directed Lombardozzi to continue taking Nasonex; recommended Zyrtec;[16] and reviewed dust mite control measures. (*Id.* at 141).

In January 2013, Lombardozzi returned to Dr. Stidham and was "doing well." (ECF No. 8-2 at 37–38). In April 2013, Lombardozzi reported reoccurring symptoms and stated that the allergist had recommended allergy injections, but he had not yet received them. (ECF No. 8-1 at 256). Dr. Stidham observed that most of Lombardozzi's symptoms appeared to be allergy related and there was evidence of sinusitis. (*Id.* at 257).

In June 2013, Lombardozzi followed up and complained of nasal congestion. (*Id.* at 219). A left external auditory canal exam showed purulent discharge. (*Id.* at 220). A right tympanum exam showed serous exudate behind the membrane and a left exam showed pus behind the membrane. (*Id.*). Dr. Stidham recommended Floxin and Levaquin[17] and referred Lombardozzi to Dr. Deya Jourdy for a nasal assessment. (*Id.*). Two weeks later, Lombardozzi's left ear improved and Dr. Stidham placed a tympanostomy tube in the right ear. (ECF No. 8-2 at 21–22). Lombardozzi also visited Dr. Jourdy, who performed an endoscopic nasal/sinus

---

[15] During a percutaneous test, or a prick or scratch test, a tiny drop of a possible allergen is pricked or scratched into the skin. *Testing & Diagnosis*, AM. COLL. ALLERGY, ASTHMA & IMMUNOLOGY, https://acaai.org/allergies/testing-diagnosis [https://perma.cc/79JJ-PLR8].

[16] Zyrtec is a brand name for cetirizine and pseudoephedrine, a combination of an antihistamine and a decongestant, used to treat symptoms of seasonal allergies. *Cetirizine and Pseudoephedrine (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/cetirizine-and-pseudoephedrine-oral-route/description/drg-20061557 [https://perma.cc/2PCM-M37A].

[17] Floxin is a brand name for Ofloxacin and Levaquin is a brand name for Levofloxacin, which are used to treat certain bacterial infections. *Ofloxacin (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/ofloxacin-oral-route/description/drg-20072196 [https://perma.cc/SFJ3-UPVJ]; *Levofloxacin (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/levofloxacin-oral-route/description/drg-20064518 [https://perma.cc/J7P4-D58R].

examination, which revealed a severely deviated nasal septum,[18] obstructed eustachian tubes, and severe nasopharynx inflammation and tissue growth bilaterally.  (ECF No. 8-1 at 136–37).  Dr. Jourdy recommended Dymista[19] for allergy control and referred Lombardozzi to Dr. Mike Yao for evaluation of the nasopharynx tissue growth.  (*Id.* at 136).

In July 2013, Dr. Yao suspected that a mass in Lombardozzi's nasopharynx and lymphadenopathy was nasopharyngeal cancer.  (ECF No. 8-2 at 16–17).  Dr. Yao performed a biopsy and ordered diagnostic imaging (*id.* at 17; *see* ECF No. 8-1 at 175), which revealed nasopharyngeal carcinoma/nasopharyngeal cancer (ECF No. 8-1 at 181–82, 295–96).

In September 2013, Dr. Yao noted that Lombardozzi had been receiving radiation and chemotherapy and the tumor and mass were shrinking considerably.  (*Id.* at 213–14).  In October 2013, Dr. Yao noted that Lombardozzi had completed radiation and chemotherapy.  (*Id.* at 259).  Upon examination, Dr. Yao observed that the mass in the right nasopharynx had resolved but the left nasal passage was blocked by a mass.  (*Id.* at 260).  Dr. Yao suggested a nasal biopsy.  (*Id.*).  Dr. Yao also noted that the ear tubes had been clogged and the right ear canal had wet squamous debris, which Dr. Yao removed.  (*Id.*).  Lombardozzi's hearing was "grossly normal."  (*Id.*).

In November 2013, Dr. Yao noted that the nasal biopsy showed fibrinous debris from mucositis and no cancer.  (*Id.* at 221–22; *see* ECF No. 8-2 at 51).  Lombardozzi complained of diminished hearing in the right ear.  (ECF No. 8-1 at 300).  Upon examination, Lombardozzi's ear tubes had reclogged, but his hearing was "grossly normal."  (*Id.* at 222, 300).

---

[18] A deviated septum occurs when the thin wall between the nasal passages is displaced to one side, i.e., off-center. In severe cases, a deviated septum can block one side of the nose and reduce airflow.  *Deviated Septum: Overview*, MAYO CLINIC (Sept. 14, 2021), https://www.mayoclinic.org/diseases-conditions/deviated-septum/symptoms-causes/syc-20351710 [https://perma.cc/LF8J-3Z5Q].

[19] Dymista is a brand name for azelastine and fluticasone, a combination nasal spray, used to treat allergic rhinitis. *Azelastine and Fluticasone (Nasal Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/azelastine-and-fluticasone-nasal-route/description/drg-20075580 [https://perma.cc/9BZZ-72QX].

February 2014 diagnostic imaging revealed fludeoxyglucose uptake in the right lateral nasopharynx.  (*Id.* at 277–78).  In March 2014, Dr. Yao performed another biopsy, which revealed no cancer.  (*Id.* at 274–75).  Lombardozzi's ears had cerumen, which was removed.  (*Id.* at 275).  The right ear canal appeared mildly infected, and Dr. Yao recommended Ciprodex ear drops.[20]  (*Id.* at 275–76).

In April 2014, Dr. Yao observed that Lombardozzi had loss of hearing in the right ear and referred him back to Dr. Stidham.  (*Id.* at 303–05).  Lombardozzi told Dr. Stidham that he was experiencing a "popping and plugging sensation," worse on the right ear, and had left ear discomfort.  (*Id.* at 307).  Upon examination, Dr. Stidham observed cerumen, crusting, debris, and hyperemia.[21]  (*Id.* at 307–08).  Dr. Stidham could not dislodge hard crust that was filling the right ear tube.  (*Id.* at 308).  Dr. Stidham assessed that some of Lombardozzi's hearing loss may be due to sensorineural hearing loss[22] but appeared to also have a closed head injury component as well.  (*Id.*).  Dr. Stidham placed another tympanostomy tube in the right ear.  (*Id.*).  Later that month, Lombardozzi urgently returned because of right ear discomfort.  (*Id.* at 138).  An examination revealed hyperemia, serous exudate, and mucoid.  (*Id.* at 139).  An audiology exam showed stable thresholds in the left ear and decline in mid-high frequencies in the right ear.  (*Id.* at 138).  In May 2014, Dr. Stidham diagnosed asymmetric hearing loss, worse on the right ear,

---

[20] Ciprodex is a brand name for ciprofloxacin and dexamethasone, which are ear drops, used to treat ear infections. *Ciprofloxacin and Dexamethasone (Otic Route)*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/ciprofloxacin-and-dexamethasone-otic-route/description/drg-20061674 [https://perma.cc/Q3CZ-TA42].

[21] Hyperemia is the presence of increased blood in a body part.  *Hyperemia*, Nat'l Libr. Med., https://www.ncbi.nlm.nih.gov/medgen/43777 [https://perma.cc/7KPZ-GKG5].

[22] Sensorineural hearing loss occurs when the inner ear or the actual hearing nerve becomes damaged.  Sensorineural loss is the most common type of hearing loss.  It can be caused by aging, exposure to loud noise, injury, disease, certain drugs, or an inherited condition.  This type of hearing loss is typically not medically or surgically treatable, but hearing aids can be beneficial.  *Types of Hearing Loss*, John Hopkins Med., https://www.hopkinsmedicine.org/health/conditions-and-diseases/hearing-loss/types-of-hearing-loss [https://perma.cc/77YM-ZSG4].

which might have related to radiation.  (*Id.* at 262–63).

In June 2014, Dr. Yao noted that there was no evidence of disease as to the nasopharynx and observed that Lombardozzi had bilateral hearing loss.  (*Id.* at 189–91).

In August 2014, Dr. Stidham noted new mucoid in both ears, which were "thick enough" to impact hearing, but Lombardozzi "felt much better after [a] cleaning."  (*Id.* at 163–64).  Two weeks later, Dr. Stidham observed that the left ear was better, but the right ear still had mucoid, which was partially cleared through insufflation.  (*Id.* at 224–25).  In September 2014, Dr. Stidham replaced the right tympanostomy tube because it appeared to be nonfunctional.  (*Id.* at 165–66).

In October 2014, Dr. Stidham noted that the tympanostomy tubes were functioning.  (*Id.* at 119–20).  Lombardozzi appeared with cerumen, crusting, and wax, which were contributing to a sound in his ear, but the sound was resolved by clearing the ear.  (*Id.* at 120).  Dr. Stidham also noted that Lombardozzi was "not interested in hearing aids" at that time.  (*Id.*).

In December 2014, Dr. Stidham removed the right tympanostomy tube because of an "ongoing clicking" noise.  (*Id.* at 153–54).  In March 2015, Dr. Stidham assessed that Lombardozzi was feeling better and stable without the tube.  (*Id.* at 192–93, 297–98).  During that visit, Dr. Stidham removed cerumen from each ear.  (*Id.* at 298).

In July 2015, Dr. Stidham noted a small perforation at the right tympanum.  (*Id.* at 170–72).  Dr. Stidham placed a paper patch over the perforation.  (*Id.* at 171–72).  During that visit, Lombardozzi had a "subjective sense" that his hearing was worse and Dr. Stidham concluded that it was likely due to asymmetric hearing loss.  (*Id.* at 171).  In August 2015, Lombardozzi returned, saying that he felt better despite mucoid effusion that Dr. Stidham suctioned out.  (*Id.* at 129–30).  Dr. Stidham replaced the paper patch.  (*Id.* at 130–31).

In October 2015, Lombardozzi felt better with the hole closed and chose tympanoplasty.[23]  (*Id.* at 183–85).  During that visit, Dr. Stidham was concerned about possible skin debris in the middle ear rather than dried mucous.  (*Id.* at 184).  In November 2015, Lombardozzi underwent right ear tympanoplasty and was "doing well since surgery with no problems."  (*Id.* at 285).  In December 2015, Lombardozzi was "healing well" and had "no ear complaints."  (*Id.* at 230–31).

In January 2016, Lombardozzi felt that his right ear was "full and popping."  (*Id.* at 195).  Dr. Stidham cleaned the ear (*id.* at 196), and in February 2016, Lombardozzi was feeling better, with no ear problems (*id.* at 145).  Also in February 2016, Lombardozzi saw Dr. JK Rasamny, who observed "possible recurrent disease" of the nasopharynx based on CT scans.  (*Id.* at 226–27).  Dr. Rasamny ordered a PET scan, which was "completely clear" of his concerned findings.  (*Id.* at 200–01).

In June 2016, Lombardozzi returned to Dr. Stidham (ECF 8-2 at 67–69), and stated he had no noticeable problems with his right ear; but audio testing showed a decline in hearing thresholds, (*id.* at 67).  Dr. Stidham observed a small perforation in the left tympanum, which had myringosclerosis[24] and mucoid.  (*Id.* at 68–69).  In July 2016, Dr. Stidham also observed recurring perforation of the right tympanum.  (ECF 8-1 at 159–61).  In November 2016, Lombardozzi returned and was "doing well" despite the perforations in each ear.  (*Id.* at 121–22).

In January 2017, Dr. Stidham discussed the need for revision surgery due to cholesteatoma of the right tympanum (*id.* at 282–83), which was performed in March 2017 (ECF

---

[23] Tympanoplasty is a microsurgery to fix holes in the eardrum that do not heal on their own.  *Tympanoplasty*, JOHN HOPKINS MED., https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/tympanoplasty [https://perma.cc/2CKU-EY8X].

[24] Myringosclerosis or tympanosclerosis is the medical term of scarring of the eardrum.  *What is Tympanosclerosis*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/24265-tympanosclerosis [https://perma.cc/6ZRN-AQWV].

8-2 at 19–20, 46–48, 114–16).  Post-operation, Lombardozzi was healing and doing well.  (ECF 8-1 at 173–74, 287–88; ECF 8-2 at 52–53).  In October 2017, Lombardozzi underwent a "relook procedure" due to the extent of his middle ear cholesteatoma (ECF Nos. 8-1 at 236–37; 8-2 at 54–56, 117–19), and post-surgery, Lombardozzi was healing and doing well, with no problems (ECF Nos. 8-1 at 290–91; 8-2 at 24–25).

In December 2017, Lombardozzi reported "a little fullness in [his] ear but [was] otherwise doing ok."  (ECF No. 8-1 at 187–88).  In January and March 2018, he said that his "hearing improved" and had "been stable."  (*Id.* at 216, 268).  In May 2018, his right ear was "maturing nicely."  (ECF No. 8-2 at 6, 106).

In August 2018, Lombardozzi complained of "throbbing" on the right side of his head around his ear.  (ECF No. 8-1 at 271).  Upon examination, Dr. Stidham observed scarring and inflammation over the tympanum and possible mastoiditis.[25]  (*Id.* at 272).  Dr. Stidham performed a CT scan, which returned "normal," and Dr. Stidham treated the mastoid as an infection.  (*Id.* at 273; ECF No. 8-2 at 8, 57, 108).  Dr. Stidham cleaned the inflammation and performed a Kenalog injection.[26]  (ECF No. 8-1 at 272).  Two weeks later, Lombardozzi reported "feeling much better" but still had pressure in the right mastoid.  (ECF No. 8-2 at 9, 109).  Upon examination, Dr. Stidham found "much less inflammation" over the tympanum and performed another Kenalog injection.  (*Id.* at 10, 110).  She explained that Lombardozzi "may also have chronic fluid in mastoid."  (*Id.* at 11, 111).

In October 2018, Lombardozzi returned to Dr. Rasamny, who assessed that Lombardozzi

---

[25] Mastoiditis is an infection of the mastoid, the bony protrusion behind the ear.  *Ear Infection (Middle Ear)*, MAYO CLINIC (July 23, 2021), https://www.mayoclinic.org/diseases-conditions/ear-infections/symptoms-causes/syc-20351616 [https://perma.cc/QP4C-X6GD].

[26] Kenalog is the brand name for Triamcinolone, a corticosteroid injection used to treat inflammation.  *Triamcinolone (Injection Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/triamcinolone-injection-route/description/drg-20074674 [https://perma.cc/3QQY-4HNB].

was "doing very well from a cancer standpoint."  (*Id.* at 12, 60–61).

In January 2019, Dr. Stidham observed that both mastoids appeared normal.  (*Id.* at 14). She noted that the left tympanum had a perforation but was stable.  (*Id.*).  She also removed cerumen that had accumulated in each ear.  (*Id.* at 15, 34).

In April 2019, Lombardozzi informed Dr. Stidham that he was doing very well, had no problem with pain or plugging of his ears, no vibratory or buzzing noises that he had experienced before, and his hearing felt stable.  (ECF No. 8-1 at 249).  An audiogram showed improvement in high frequency hearing loss in the left ear and stable mixed sloping mild-to-profound hearing loss in the right ear.  (*Id.*).  Dr. Stidham also assessed that the left tympanic perforation appeared to have healed.  (*Id.* at 250).  She again removed cerumen bilaterally.  (*Id.* at 250–51; ECF No. 8-2 at 29).

In July 2019, Lombardozzi reported having "clogged ears," severe nasal congestion, a sensation that his throat was "closing up," and dizziness.  (ECF No. 8-1 at 209).  Dr. Stidham assessed acute sinusitis.  (*Id.* at 210).  In September 2019, Lombardozzi returned and noted that his sinuses felt better, his ears were still "clogged," with a sense of "fullness" and hearing loss of the left ear, and a "fullness" sensation of the throat.  (*Id.* at 238).  Dr. Stidham assessed that the sinusitis had improved.  (*Id.* at 240).

In October 2019, Lombardozzi stated that he visited the emergency room because he had increased dizziness and had a pressure sensation in his sinuses and ears.  (ECF No. 8-2 at 85). Dr. Stidham assessed that the dizziness and pressure were linked to the middle ear and sinuses, but there was no evidence of acute infection.  (*Id.* at 86).  She recommended that Lombardozzi complete a balance test.  (*Id.* at 87).

In November 2019, Lombardozzi visited Amanda Muldoon, Au.D., who performed

multiple balancing tests that returned results "within normal limits." (*Id.* at 75–80). A cervical vestibular evoked myogenic potential ("cVEMP") test[27] returned "inconclusive." (*Id.* at 76).

In March 2020, Lombardozzi returned to Dr. Stidham (*id.* at 1–4); he reported "doing well" and noted a left clogged ear and sore throat (*id.* at 1). Dr. Stidham assessed that Lombardozzi's sinusitis was "intermittent" but acute on examination. (*Id.* at 3).

In July 2020, Lombardozzi reported that his right ear was "feeling healthy" but his left ear was experiencing a "plugging and pulsatile sensation." (ECF No. 8-1 at 145). He denied any acute issues with his nose or throat. (*Id.*). Upon examination, Dr. Stidham assessed that Lombardozzi had a "new mucoid discharge" on the left ear, which "may just be allergic mucous," but appeared to have an infectious component. (*Id.* at 146). Dr. Stidham performed a culture, which returned positive, and she prescribed an antibiotic. (*Id.*; ECF No. 8-2 at 94). Lombardozzi followed up in August 2020, and Dr. Stidham noted that the infection had been resolved. (ECF No. 8-1 at 242–43).

In October 2020, Lombardozzi reported having "problems with yellowish discharge" from his throat, nose, and left ear. (ECF No. 8-2 at 138). Upon examination, Dr. Stidham found "[t]hick yellow mucoid discharge from [a] perforation" in the left tympanic membrane. (*Id.* at 139). A nasal examination revealed "[p]urulent mucous" bilaterally. (*Id.* at 140). In March 2021, Lombardozzi reported that treatment had cleared up the mucus. (*Id.* at 177). Lombardozzi reported crusting in his ears, which Dr. Stidham removed. (*Id.* at 177, 180). Dr. Stidham also observed that Lombardozzi's "hearing appear[ed] to be grossly intact to speech." (*Id.* at 178).

In November 2021, Lombardozzi returned with "mucous in the left ear and associated

---

[27] A cVEMP test is used to assess the vestibular system by measuring the electromagnetic potentials generated from muscles across the neck in response to sound stimulation. *Cervical Vestibular Evoke Myogenic Potential (cVEMP) Test*, WEILL CORNELL MED., https://ent.weill.cornell.edu/patients/clinical-specialties/conditions/cervical-vestibular-evoked-myogenic-potential-cvemp-test [https://perma.cc/9TXR-P6AH].

plugged hearing." (*Id.* at 194).  Dr. Stidham observed "inflammatory tissue over [the right] anterior eardrum" and a perforation and mucoid in the left tympanum.  (*Id.* at 195).  She treated the inflammation with a Kenalog injection and performed an ear culture.  (*Id.* at 196).

In December 2021, Lombardozzi reported that he was "hearing overall pretty well on [the] left side" and the right side was also "overall feeling better" but not as clear as on the left. (*Id.* at 190).  An audiogram "demonstrate[d] improved hearing compared to prior" exams, with the "left ear hearing being in the normal range in the low frequencies with a steep drop off in the high frequencies." (*Id.*).  On the right side, he had "moderate to profound" hearing loss that was "stable." (*Id.*).  Dr. Stidham performed another Kenalog injection.  (*Id.* at 192).

2.  Function Report

Lombardozzi and his brother, Dominick, submitted function reports on September 23, 2020.  (ECF No. 8-1 at 4–19).  Dominick reported as follows.  (*Id.* at 4–11).  Lombardozzi suffered from fatigue.  (*Id.* at 4). With Dominick's help, Lombardozzi would perform some house chores, such as cleaning, mowing, cooking, and laundry, when he was able to.  (*Id.* at 5–6).  Lombardozzi would get around by walking and driving.  (*Id.* at 7).  He could shop for food in stores, pay bills, count money, and manage a bank account.  (*Id.*).

Lombardozzi reported as follows.  (*Id.* at 12–19).  He cared for his mother, who suffered from amyotrophic lateral sclerosis (ALS).  (*Id.* at 13).  He did not need reminders to care for personal needs, grooming, and taking medication.  (*Id.* at 14).  He would prepare his own meals daily and perform house cleaning and laundry weekly.  (*Id.*).  He could drive a car.  (*Id.* at 15). Dominick would shop for him, but he could shop once a week.  (*Id.*).

3.  Consultative Examination

In December 2020, Dr. Allen Meisel performed a consultative examination.  (ECF No. 8-

2 at 162–66).  Dr. Meisel performed a qualitative hearing assessment, which revealed that

Lombardozzi could not hear a "finger rub bilaterally" or "forced whisper." (*Id.* at 163).

Audiologic testing revealed "mild hearing loss from 250 to 2000 Hz sloping to marked hearing

loss thereafter in both ears." (*Id.* at 164).  Dr. Meisel diagnosed mild conductive hearing loss at

250 to 2000 Hzs with moderate to marked hearing loss at and above 200 Hz. (*Id.*).

Dr. C. Li and Dr. S. Powell, two state agency medical consultants, issued mirroring

functional assessments, in December 2020 and April 2021, respectively.  Those assessments both

stated that based on the evidence, Lombardozzi's "medically determinable impairments could

have reasonably been expected to produce the alleged symptoms; however, [Lombardozzi's]

statements concerning the intensity, persistence and limiting effects of these symptoms [were]

generally not consistent with the evidence of record." (ECF No. 8 at 71, 84).  They assessed that

Lombardozzi had no exertional, postural, manipulative, or visual limitations. (*Id.* at 72, 84–85).

They also found that Lombardozzi had a communicative limitation as to hearing with "mild

hearing los[s] from 250–200Hz." (*Id.* at 72–73, 85).  He could "perform average tasks

frequently" but could not "perform tasks which require whisper hearing." (*Id.* at 73, 85).

Notably, Dr. Powell's assessment included medical evidence between February and April 2021.

(*See id.* at 79–81).

### 4.  July 2022 ALJ Hearing

At the July 2022 ALJ hearing, Lombardozzi appeared with counsel. (ECF No. 8 at 38–

39).  Counsel amended the alleged onset date to August 31, 2020. (*Id.* at 41–42).

Lombardozzi testified as follows. (*Id.* at 43–60).  He resided with his mother. (*Id.* at 43).

He would care for his mother together with others. (*Id.* at 44).  He could drive a car but had a

"hard time driving" due to "balance issues." (*Id.* at 43).  He could prepare simple meals. (*Id.* at

14

45).  He could shop at stores, but he rarely shopped.  (*Id.* at 45–46).  He had difficulties with

performing household chores.  (*Id.* at 46–47).  For example, he tried using a leaf blower, but after

20 minutes, he had to lay down.  (*Id.* at 47).  His mother's aides usually performed the household

cleaning and laundry chores.  (*Id.* at 47–49).  But he managed to do his own laundry.  (*Id.* at 49).

He had difficulties reading and browsing the internet due to "confusion."  (*Id.* at 48).

As for his hearing, he could hear the ALJ over the speakerphone "at a very low tone."

(*Id.* at 52).  "[W]hen a normal person" would speak to him, it would be "hard for [him] to hear."

(*Id.* at 52).  When asked if he had difficulties when people would speak softly to him, he said,

"Right."  (*Id.* at 52).  When asked if he had problems hearing in areas with a lot of background

noise, he said, "Oh yeah."  (*Id.* at 53).  He would get headaches and earaches, but every four

months, he would visit his doctor to unclog his ears, which helped with the pain.  (*Id.* at 56).  His

balancing and dizziness issues stemmed from his ear issues.  (*Id.* at 57–58, 60).

He also had nasal issues, allergies to dust, a "dry mouth," "blurriness," difficulty

focusing, and "sleep pattern problems."  (*Id.* at 54, 57–58, 60).

The ALJ called Robert Paterwic, a vocational expert, to testify.  (*Id.* at 60–63).  The ALJ

posited a hypothetical person, with Lombardozzi's age, education, work experience, and without

exertional limitations, but who was limited as to concentrated exposure to atmospheric

conditions, unprotected heights, hazardous machinery, no more than a moderate sound noise

level, and did not require the hearing of quiet sounds, defined as those requiring whisper hearing.

(*Id.* at 61).  Paterwic testified that such a person could perform the duties of a: (1) hand packager,

DOT Code 920.587-018; (2) laundry laborer, DOT Code 361.687-010; and (3) cook's helper,

DOT Code 317.687-010.[28]  (*Id.* at 61–62).  Each job was classified as SVP 2,[29] medium exertional level, and unskilled work, and did not require hearing.  (*Id.*).  But if the hypothetical individual would miss two days of work per month or be "off-task for 20% of the work period" due to pain, then the individual would be unable to perform full-time work.  (*Id.* at 62–63).

Paterwic acknowledged that there were portions of the hypothetical where the DOT Code was silent, but he confirmed that he had considered all parts of the hypothetical, even where the DOT Code was silent, and his response was based on his training, experience, and observation of these jobs being performed while placing people in work.  (*Id.*).  Additionally, no part of the hypothetical conflicted with the DOT Code.  (*Id.* at 63).

## II.   LEGAL STANDARDS

### A.    Standard of Review

This Court "engage[s] in limited review" of the Commissioner's decision.  *Schillo v. Saul*, 31 F.4th 64, 74 (2d Cir. 2022).  The Court "conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied."  *Id.*; *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  "The substantial

---

[28] The DOT Code refers to the Dictionary of Occupational Titles, a U.S. Department of Labor publication.  *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 446 (2d Cir. 2012) (per curiam).  The DOT gives a job type a specific code and establishes, among other things, the minimum skill level and physical exertion capacity required to perform that job.  *Id.*  The DOT code is "useful for determining the type of work a disability applicant can perform" and "is so valued that a [vocational expert] whose evidence conflicts with the DOT must provide a 'reasonable explanation' to the ALJ for the conflict."  *Id.*

[29] "SVP" stands for "Specific Vocation Preparation."  *Blau v. Berryhill*, 395 F. Supp. 3d 266, 270 (S.D.N.Y. 2019).  SVP is defined "as the 'amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.'"  *Id.* at 270 n.2 (quoting *O*NET OnLine Help*, O*NET ONLINE, https://www.onetonline.org/help/online/svp [https://perma.cc/T5E8-S5QP]).  "The SVP 'levels' correspond to time periods."  *Id.*  For example, Level 2 is "[a]nything beyond short demonstration up to and including 1 month" and Level 4 is "[o]ver 3 months up to and including 6 months."  *O*NET OnLine Help*, *supra*.

evidence standard is a very deferential standard of review," such that it is not the function of the Court "to determine *de novo* whether a plaintiff is disabled." *Schillo*, 31 F.4th at 74 (internal quotation marks omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). "[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* "If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." *Id.* "[O]nce an ALJ finds facts, [this Court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Id.* (internal quotation marks omitted).

But "where an error of law has been made that might have affected the disposition of the case, this [C]ourt cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (alteration and internal quotation marks omitted). Thus, "[f]ailure to apply the correct legal standards is grounds for reversal." *Id.* "When there are gaps in the administrative record or the ALJ has applied an improper legal standard," or when the ALJ's rationale is unclear "in relation to the evidence in the record," the Court may remand to the Commissioner "for further development of the evidence" or for an explanation of the ALJ's reasoning. *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996); *accord Fowlkes v. Adamec*, 432 F.3d 90, 98 (2d Cir. 2005).

**B.     Statutory Disability**

Under the Social Security Act, a claimant is disabled when the claimant lacks the ability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A),

1382c(a)(3)(A); *Schillo*, 31 F.4th at 69–70.  The claimant is eligible for disability benefits

> only if his physical or mental impairment or impairments are of such severity that
> he is not only unable to do his previous work but cannot, considering his age,
> education, and work experience, engage in any other kind of substantial gainful
> work which exists in the national economy, regardless of whether such work
> exists in the immediate area in which he lives, or whether a specific job vacancy
> exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

The Social Security Regulations, 20 C.F.R. § 404.1520(a)(4)(i)–(v), set forth a five-step

analysis for evaluating whether a person is disabled under the Social Security Act.  *See Schillo*,

31 F.4th at 70.  "If at any step a finding of disability or nondisability can be made, the

Commissioner will not review the claim further."  *Id.* (alteration and internal quotation marks

omitted).  Under the five-step process, the Commissioner determines the following:

> (1) whether the claimant is currently engaged in substantial gainful activity;
> (2) whether the claimant has a severe physical or mental impairment, or
> combination of severe impairments;[30]
> (3) whether the impairment (or combination) meets or equals the severity of one
> of the impairments specified in 20 C.F.R. Part 404, Subpart P, Appendix 1
> ("Listing of Impairments");[31]
> (4) whether, based on an assessment of the claimant's residual functional
> capacity, the claimant can perform any of her past relevant work;[32] and
> (5) whether the claimant can make an adjustment to other work given the

---

[30] A severe impairment is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c), 416.920(c).

[31] Listed impairments are presumed severe enough to render an individual disabled, and the criteria for each listing are found in Appendix 1 to Part 404, Subpart P of the SSA regulations.  20 C.F.R § 404.1520(a)(4)(iii), (d), 416.920(a)(4)(iii), (d).  If the claimant's impairments do not satisfy the criteria of a listed impairment at step three, the Commissioner moves on to step four and must determine the claimant's residual functional capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).

[32] A claimant's RFC represents "the most [the claimant] can still do despite [their] limitations."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

claimant's residual functional capacity, age, education, and work experience.[33] *Schillo*, 31 F.4th at 70 (citing 20 C.F.R. § 404.1520(a)(4)(i)–(v)). "At step three, the [Commissioner] determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies." *Barnhart v. Thomas*, 540 U.S. 20, 24–25 (2003). But "[i]f the claimant's impairment is not on the list, the inquiry proceeds to step four." *Id.* "The claimant bears the burden of proof in the first four steps of the sequential inquiry." *Schillo*, 31 F.4th at 70. "In step five, the burden shifts, to a limited extent, to the Commissioner to show that other work exists in significant numbers in the national economy that the claimant can do." *Id.* "Because the shift in step five is limited, the Commissioner need not provide additional evidence of the claimant's residual functional capacity." *Id.* (internal quotation marks omitted).

## III.   THE ALJ'S DECISION

To assess Lombardozzi's disability claim, the ALJ applied the five-step sequential analysis. (*See* ECF doc. 8 at 19–28; 20 C.F.R. § 404.1520(a)(4)(i)–(v)). At step one, the ALJ concluded that Lombardozzi had not engaged in substantial gainful activity since August 31, 2020, the amended alleged onset date. (ECF No. 8 at 21–22). At step two, the ALJ concluded that Lombardozzi had the following severe impairments: hearing loss, allergic rhinitis, sinusitis, and nasopharyngeal carcinoma. (*Id.* at 22).

At step three, the ALJ determined that Lombardozzi's impairments, individually or combined, did not meet, or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*). The ALJ found that Lombardozzi's impairments

---

[33] To support a finding that the claimant is disabled, there must be no other work existing in significant numbers in the national economy that the claimant, considering his or her RFC and vocational factors, can perform. 20 C.F.R. § 404.1560(c).

did not meet or medically equal Listing 2.01 (Special Senses and Speech), Listing 3.03

(Asthma), or Listing 13.02 (Soft Tissue Cancers of the Head and Neck).[34]  (*Id.* at 22–23).  As to

Listing 2.01, the ALJ found that the record lacked "testing that showed an average air conduction

hearing threshold of 90 decibels or greater in the better ear and an average bone conduction

hearing threshold of 60 decibels or greater in the better ear."  (*Id.* at 22).  As to Listing 3.03, the

ALJ found that Lombardozzi did not have "chronic asthmatic bronchitis, or attacks in spite of

prescribed treatment and requiring physician intervention, occurring at least once every two

months or at least six times per year."  (*Id.* at 22–23).  As to Listing 13.02, the ALJ found that

Lombardozzi's "cancer was treated and has not returned."  (*Id.* at 23).

> At step four, the ALJ assessed Lombardozzi's RFC:
>
> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: avoid concentrated exposure to atmospheric conditions, unprotected heights, and hazardous machinery.  The claimant is limited to a moderate sound/noise level as defined by Dictionary of Occupational Titles/SCO.  Finally, the claimant is limited to a work environment that does not require hearing quiet sounds defined as requiring whisper hearing.

(*Id.* at 23).  In reaching this conclusion, the ALJ "considered all symptoms and the extent to

which these symptoms can reasonably be accepted as consistent with the objective medical

evidence and other evidence" in accordance with 20 C.F.R. § 416.929 and Social Security

Ruling 16-3p.  (*Id.*).

The ALJ's RFC determination used a two-step process.  First, the ALJ considered

whether the evidence revealed medical impairments that could reasonably be expected to cause

the symptoms Lombardozzi had alleged—i.e., Lombardozzi had reported and testified about the

---

[34] The ALJ also considered Lombardozzi's obesity (BMI of 31.66) and the effect of his obesity on his other impairments.  (ECF No. 8 at 22).  The ALJ observed that the medical evidence did not indicate that Lombardozzi's obesity contributed to his other severe impairments.  (*Id.*).

difficulties he was experiencing due to his hearing loss, allergic rhinitis, sinusitis, and

nasopharyngeal carcinoma.  (*Id.* at 23–24).  Second, the ALJ determined that "the severity of

[Lombardozzi's] subjective allegations [were] not supported by the medical evidence of record."

(*Id.* at 24).  Lombardozzi had reported and testified about various difficulties he was

experiencing due to his hearing loss, allergic rhinitis, sinusitis, and nasopharyngeal carcinoma.

(*Id.* at 23–24).  He stated on his function report that he had trouble balancing, ringing in his ears,

and driving impairment due to hearing loss.  (*Id.*).  He also reported problems with lifting,

squatting, bending, hearing, seeing, completing tasks, concentrating, dizziness, blurred vision,

and "a floating sensation," which he alleged had resulted from his cancer and/or cancer

treatments.  (*Id.*).  In addition, he testified about his hearing loss, asthma, and difficulties with

dust and allergens.  (*Id.* at 24).  But the ALJ concluded that the medical records did not support

those subjective allegations.  (*Id.* at 24–26).  The nasopharyngeal carcinoma had been surgically

removed and treated with radiation.  (*Id.* at 24).  He had a history of chronic eustachian tube

dysfunction, which allegedly worsened after radiation, and he had chronic ear issues.  (*Id.*).  He

developed cholesteatoma on the right side, but it was surgically removed.  (*Id.*).  He then

developed scarring, which created recurrent stenosis, which was addressed by steroid injections.

(*Id.*).  As to right ear hearing loss, an examination had revealed a "normal" auricle without scars,

lesions, or masses.  (*Id.*).  Examining the tympanic membrane revealed perforated, pus behind

the membrane, and crusting on the surface next to the tube.  (*Id.*).  But when the crusting was

removed, the ringing in his ear stopped.  (*Id.*).  An audiogram noted clear canals, "excellent"

audiometry speech understanding, with "normal hearing and only mild CHL sloping."  (*Id.*).

During a March 2020 left ear examination, "no abnormal findings were observed" and he was

"doing well."  (*Id.*).

As for his balance issues, multiple tests returned tests "within normal limits" and he was negative for vertigo.  (*Id.*).  Although he had an October 2020 diagnosis of acute sinusitis, he was prescribed Omnicef for one week and nasal irrigations.  (*Id.* at 25).

According to the ALJ, Dr. Meisel's opinion that Lombardozzi had "moderate to marked hearing loss" was "partially supported by his examination" and testing results that revealed "mild hearing loss."  (*Id.*).  This opinion aligned with the other medical evidence in the record.  (*Id.*).  But the part of the opinion noting "marked hearing loss" was inconsistent with Lombardozzi's ability to speak on the telephone and the cessation of his ringing sensation after the crust in his ear was removed.  (*Id.*).

The ALJ also concluded that Lombardozzi had the ability to perform daily activities with some physical limitations and assistance from his brother.  (*Id.*).  Those activities included caring for his mother, tending to personal care, preparing easy meals, performing light chores, doing laundry, shopping, driving, managing money, and communicating in person and on the phone.  (*Id.*).  Based on this evidence, the ALJ found that Lombardozzi "could perform work on a sustained and continuous basis" within certain parameters.  (*Id.*).

Finally, the ALJ found persuasive the opinions of Dr. Li and Dr. Powell, indicating that Lombardozzi had limited hearing in both ears.  (*Id.* at 25).  Their examination notes stated that Lombardozzi's auricle appeared normal without scars lesions, or masses, and that an audiogram noted clear canals, excellent audiometry speech understanding, normal hearing, and only mild CHL sloping.  (*Id.* at 25–26).

At step five, the ALJ concluded that based on Lombardozzi's age (52 years old, defined as closely approaching advanced age), education (limited), work experience (none), and residual functional capacity, there were jobs in significant number in the national economy that

Lombardozzi could perform.  (*Id.* at 26).  The ALJ credited the vocational expert's testimony that an individual with Lombardozzi's age, education, work experience, and residual functional capacity could perform the duties of a hand packager, laundry laborer, and a cook's helper.  (*Id.* at 26–27).  Thus, Lombardozzi was "not disabled."  (*Id.* at 28).

## IV.   DISCUSSION

Lombardozzi makes several arguments that challenge (1) the ALJ's RFC determination (in step four) and (2) the ALJ's determination that there were jobs in significant number in the national economy that Lombardozzi could perform (in step five).  (ECF No. 10 at 10–15).  As explained below, the Court finds that the ALJ's determinations were supported by substantial evidence and that no legal error occurred.

### A.   The ALJ's Residual Functional Capacity (RFC) Determination Was Supported by Substantial Evidence

Lombardozzi makes three arguments that the ALJ erred in determining his RFC without substantial evidence (in step four).  (*Id.* at 10–11, 13–15).  First, Lombardozzi argues that the ALJ wrongly determined that his RFC "is limited to a moderate sound noise level," because he suffered from "severe bilateral hearing loss" and "would not be able to work at a moderate noise environment."  (*Id.* at 11).  Second, Lombardozzi argues that the ALJ wrongly found that he could perform a full range of work, because the ALJ failed to consider objective medical evidence that "clearly show[ed] [that Lombardozzi] is not even capable of performing sedentary work," and discredited opinion evidence that found that Lombardozzi had "greater limitations" than those identified in the RFC.  (*Id.* at 13).  Third, Lombardozzi argues that the ALJ failed to comply with Social Security Ruling 96-8p in assessing his RFC.  (*Id.* at 14).  The Court addresses each of these arguments below.

1. <u>The ALJ Sufficiently Considered Record Evidence of Lombardozzi's Hearing Loss in Determining that Lombardozzi is Limited to a "Moderate Sound Noise Level" Work Environment</u>

Lombardozzi appears to argue that the ALJ "erred in stating that [Lombardozzi] is limited to a moderate sound noise level," because the ALJ disregarded whether a person with moderate hearing loss can communicate effectively in this environment. (*Id.* at 10-11). Citing to Social Security Ruling 85-15, Lombardozzi correctly observes that "[c]ommunication is an important factor in work" and "[t]he inability to hear, because it vitally affects communication, is thus of great importance." *See* SSR 85-15, 1985 WL 56857, at *7 (S.S.A. Jan. 1, 1985). But, contrary to Lombardozzi's position, it does not necessarily follow that "[i]f your hearing loss is moderate, you will have difficulty hearing instructions and following directions specially if you're working at a moderate noise level." (ECF No. 10 at 11). The rest of Social Security Ruling 85-15—the part Lombardozzi overlooks—explains that "hearing impairments do not necessarily prevent communication, and differences in types of work may be compatible with various degrees of hearing loss." SSR 85-15, 1985 WL 56857, at *7. For example, "[o]ccupations involving loud noise, such as in printing, have traditionally attracted persons with hearing impairments, whereas individuals with normal hearing have to wear ear protectors to be able to tolerate the working conditions." *Id.* "On the other hand, occupations such as bus driver require good hearing." *Id.* Thus, "[t]here are so many possible medical variables of hearing loss that consultation of vocational reference materials or the assistance of a [vocational expert] is often necessary to decide the effect on the broad world of work." *Id.* Here, the ALJ consulted a vocational expert to inquire and confirm whether the jobs he had identified required the ability to hear.[35] By doing so, the ALJ was considering that "differences in types of work may be

---

[35] The Court explains below that though the vocational expert's testimony was not entirely consistent with the DOT Code, the ALJ did not err by relying on the vocational expert's testimony.

compatible with various degrees of hearing loss." *Id.* Thus, the ALJ did not disregard whether Lombardozzi's moderate hearing loss would allow him to perform occupations in a "moderate sound noise level" environment.

Lombardozzi also argues that because Plaintiff "has a severe bilateral hearing loss," he would be unable to work in a moderate noise environment. (ECF No. at 11). This argument largely reflects Lombardozzi's disagreement with the ALJ's finding that he had moderate hearing loss, rather than marked or severe hearing loss. (*Id.* at 10–11). But the ALJ's finding is substantially supported by the record. The ALJ reviewed the record and reasonably concluded that Lombardozzi had environmental and communicative limitations that significantly affected his ability to work, but not as much as Lombardozzi alleged. (*See* ECF No. 8 at 23–26). In support of this finding, the ALJ extensively cited Lombardozzi's treating source records, the findings of the consultative physicians, and Lombardozzi's hearing testimony. (*See id.*).

For example, as cited by the ALJ, Lombardozzi had chronic eustachian tube disfunction, which worsened after radiation treatment for nasopharyngeal carcinoma. (*Id.* at 24, 167–68; ECF No. 8-1 at 262–63). Lombardozzi developed cholesteatoma on the right side, which was surgically removed. (ECF Nos. 8 at 24; 8-1 at 282–83; 8-2 at 19–20, 46–48, 114–16). The cholesteatoma removal resulted in scarring, which created recurrent stenosis, but this was addressed by steroid injections. (ECF Nos. 8 at 24; 8-1 at 272–73; 8-2 at 8, 57, 108). Lombardozzi had reported noise in his right ear, but upon examination, his auricle appeared normal, without scars, lesions, or masses. (ECF Nos. 8 at 24; 8-1 at 229, 249). A right tympanic membrane examination revealed perforation and pus behind the membrane. (ECF Nos. 8 at 24; 8-1 at 121–22, 159–61, 170–72). An audiogram noted clear canals, excellent audiometry speech understanding, normal hearing, and only mild CHL sloping. (ECF Nos. 8 at 24; 8-1 at 249; 8-2

at 190).  Although crusting was observed on the surface of the tympanic membrane next to the

tube, the removal of the crusting dissipated the sound in Lombardozzi's ear.  (ECF Nos. 8 at 24;

8-1 at 120).  As of March 2020, Lombardozzi had reported clogging of his left ear, but an

examination observed no abnormal findings and record notes revealed that Lombardozzi was

doing well.  (ECF Nos. 8 at 24; 8-2 at 1–4).

Lombardozzi's argument that he has "marked hearing loss" is based on Dr. Meisel's

consultative opinion that Lombardozzi had "moderate to marked hearing loss."  (ECF No. 8-2 at

164).  But Dr. Li and Dr. Powell opined that Lombardozzi had "mild hearing los[s]."  (ECF No.

8 at 73, 85).  As the Second Circuit has repeatedly explained, "[a]n ALJ is free to choose

between properly submitted medical opinions" and the Court must "defer to the Commissioner's

resolution of conflicting evidence."  *McGonagle v. Kijakazi*, No. 22-637, 2022 WL 17724696, at

*1 (2d Cir. Dec. 16, 2022) (Summary Order) (alteration omitted) (first quoting *Balsamo v.*

*Chater*, 142 F.3d 75, 81 (2d Cir. 1998), then quoting *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118,

122 (2d Cir. 2012)).  Thus, the ALJ was free to find Dr. Meisel's opinion only partially

persuasive and the opinions of Dr. Li and Dr. Powell persuasive.  *See id.*

Moreover, the ALJ's finding that Dr. Meisel's opinion was "partially persuasive" is

substantially supported by the record.  (ECF No. 8 at 25).  During Dr. Meisel's December 2020

examination, Lombardozzi reported hearing loss due to cancer treatment and testing only

"indicated mild hearing loss from 250 to 2000 HZ sloping to marked hearing loss thereafter in

both ears."  (*Id.* at 25; ECF No. 8-2 at 164).  As the ALJ observed, Dr. Meisel's opinion that

Lombardozzi had "moderate to marked hearing loss" was "partially supported by his

examination" of Lombardozzi, including testing results that "indicate[d] mild hearing loss."

(ECF Nos. 8 at 25; 8-2 at 163–64).  Dr. Meisel's opinion was also partially consistent with the

rest of the medical evidence, set forth above, which indicated that Lombardozzi had clear canals, excellent audiometry speech understanding, normal hearing, and only mild CHL sloping. Further, as the ALJ observed, the portion of Dr. Meisel's opinion noting "marked hearing loss" was inconsistent with Lombardozzi's ability to communicate with the ALJ by telephone (*see* ECF No. 8 at 43–60), and the removal of ringing in his ears after doctors removed crust from his ears (*see, e.g.*, ECF No. 8-1 at 120).

The ALJ also appropriately found persuasive the opinions of Dr. Li and Dr. Powell that Lombardozzi had "limited" hearing in both ears because their opinions were supported by and consistent with the record evidence, set forth above, that substantially supported the ALJ's finding that Lombardozzi had moderate hearing loss. (*See* ECF No. 8 at 71–73, 84–85). Further, Dr. Powell had the benefit of reviewing more recent medical records, from March 2021, which revealed that Lombardozzi's hearing appeared to be grossly intact to speech. (*Id.* at 82; *see* ECF No. 8-2 at 178).

In sum, the ALJ's determination that Lombardozzi suffered from moderate hearing loss, rather than a greater hearing loss, is substantially supported by the record. And there is no basis for Lombardozzi's conjecture that his moderate hearing loss would not allow him to work in a "moderate noise level" environment.

2. The ALJ's Determination that Lombardozzi Had the RFC to Perform a Full Range of Work at All Exertional Levels Was Supported by Substantial Evidence

Lombardozzi also argues that the ALJ's finding was erroneous that he had the RFC to perform a full range of work at all exertional levels but with certain nonexertional limitations. (ECF No. 10 at 13–14). In support, he writes that the ALJ "did not consider the objective medical evidence and discredited the opinion evidence which opined greater limitations than [those] noted in the residual functional capacity." (*Id.* at 13). According to Lombardozzi, "[a]

review of the medical record clearly shows [he] is not even capable of performing sedentary work."  (*Id.*).

Lombardozzi fails to identify the "objective medical evidence" that the ALJ disregarded or the "opinion evidence [that] opined greater limitations" that the ALJ inappropriately discredited.  (*Id.*).  He also fails to identify evidence in the medical record that "clearly shows [that he] is not even capable of performing sedentary work."[36]  (*Id.*).  In any event, Lombardozzi's argument is meritless because the ALJ's determination that Lombardozzi had the RFC to perform a full range of work at all exertional levels was supported by substantial evidence.  That evidence includes Dr. Stidham's treatment records, audiogram and balance function testing, Dr. Meisel's complete ear consultative examination, and evidence of Lombardozzi's daily activities.  (ECF No. 8 at 23–26).  The record evidence also does not suggest that Lombardozzi had greater limitations than those set forth in the ALJ's decision.

As noted above, Lombardozzi had a history of nasopharyngeal carcinoma, which was removed surgically and treated with radiation.  (ECF Nos. 8 at 24; 8-1 at 175, 181–82, 213–14, 259–60, 295–96; 8-2 at 16–17).  Lombardozzi reported balance issues, but a series of balancing tests returned results within normal limits, with only cVEMP testing returning inconclusive. (ECF Nos. 8 at 24; 8-2 at 75–80, 85–87).  In October 2020, Lombardozzi was diagnosed with acute sinusitis and an examination revealed moderate inflamed mucosa, but he was only

---

[36] The Commissioner argues that the Court may deem Lombardozzi's perfunctory arguments waived.  (ECF No. 15 at 22).  But the cases cited by the Commissioner invoke a well-settled "*appellate* rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."  *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001) (emphasis added).  Some district courts, including cases cited by the Commissioner, have applied this rule.  *See Hilton v. Kijakazi*, 602 F. Supp. 3d 558, 570 (S.D.N.Y. 2022); *Pezza v. Comm'r of Soc. Sec.*, No. 19-cv-3254, 2020 WL 3503170, at *4 (E.D.N.Y. June 29, 2020).  But given that the rule is one of *appellate* review, *Tolbert*, 242 F.3d at 75, and is grounded in the requirements of Rule 28 of the Federal Rule of Appellate Procedure about what an *appellate* brief must contain, *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 107 (2d Cir. 2012), the Court is uncertain whether district courts may reject an argument merely because it is perfunctory.  Thus, out of abundance of caution, rather than finding the argument waived, the Court determines that the argument is meritless for the reasons discussed above.

prescribed Omnicef for one week and nasal irrigations.  (ECF Nos. 8 at 25; 8-2 at 138–39).

Finally, Lombardozzi's testimony revealed that he could perform a wide array of activities

despite his impairments.  (ECF No. 8 at 25, 34–49).  For example, Lombardozzi testified that he

lives independently with his mother, who he cares for daily with the help of home health aides.

(*Id.* at 47–49).  And while he reports some physical limitations and receives some help from his

brother, he tends to his personal care, prepares easy meals, performs light chores, does laundry,

shops, drives, and manages money.  (*Id.* at 25, 43–49).  Also, Lombardozzi could communicate

with the ALJ over the phone during his hearing and his testimony revealed that he could

communicate in person.  (*Id.* at 25, 52–53).  Thus, the ALJ's conclusion that Lombardozzi's

level of activity suggested that he could perform work on a sustained and continuous basis within

certain specified parameters (*id.* at 23), is supported by substantial evidence.

Further, under the substantial evidence standard of review, it is insufficient for

Lombardozzi to merely disagree with the ALJ's evaluation of the evidence or to argue that the

evidence could support his position.  *See Schillo*, 31 F.4th at 74.  Rather, Lombardozzi must

show that no reasonable factfinder could have reached the ALJ's conclusions on this record.  *See

id.*  Here, Lombardozzi has not made such a showing, nor has he established a more restrictive

RFC than the one the ALJ found.  Thus, the ALJ's determination that Lombardozzi could

perform a full range of work at all exertional levels is supported by substantial evidence.

### 3.  The ALJ Did Not Commit Legal Error by Failing to Comply with SSR 96-8p in Assessing Lombardozzi's RFC

Lombardozzi argues that the ALJ's RFC analysis failed to comply with Social Security

Ruling 96-8p, because the ALJ did not assess Lombardozzi's capacity to perform each physical

function to decide that he could do a full range of work at all exertional levels.  (ECF No. 10 at

14–15).  In other words, Lombardozzi argues that the ALJ failed to conduct a function-by-

function assessment of Lombardozzi's RFC.[37]  But this argument is meritless because an ALJ's

failure to conduct a function-by-function assessment is not per se error requiring remand and, as

explained above, the ALJ's RFC determination was supported by substantial evidence.

Social Security Ruling 96-8p explains that "in order for an individual to do a full range of

work at a given exertional level, such as sedentary, the individual must be able to perform

substantially all of the exertional and nonexertional functions required in work at that level.

Therefore, it is necessary to assess the individual's capacity to perform each of these functions in

order to decide which exertional level is appropriate and whether the individual is capable of

doing the full range of work contemplated by the exertional level."  SSA 96-8p, 1996 WL

374184, at *3 (S.S.A. July 2, 1996).  But the Second Circuit has held that the ALJ's failure to

conduct an explicit function-by-function analysis is not a per se error requiring remand.

*Cichocki v. Astrue*, 729 F.3d 172, 173–74 (2d Cir. 2013) (per curiam).  Instead, "[w]here an

ALJ's analysis at Step Four regarding a claimant's functional limitations and restrictions affords

an adequate basis for meaningful judicial review, applies the proper legal standards, and is

supported by substantial evidence such that additional analysis would be unnecessary or

superfluous, . . . remand is not necessary merely because an explicit function-by-function

analysis was not performed."  *Id.*  In *Cichocki*, for example, the ALJ "did not include an explicit

function-by-function analysis of all possible limitations, but did address all relevant limitations."

*Id.* at 178.

Here, as in *Cichocki*, the ALJ's decision addressed all *relevant* limitations.  *Id.*  For

example, the ALJ did not analyze the physical functions described in 20 C.F.R. §§ 404.1545(b),

---

[37] Lombardozzi's memorandum of law specifically mentions the function-by-function assessment but in the context of a different argument about moderate noise level.  (*See* ECF No. 10 at 10).  But the cited Social Security Ruling described above more directly addresses this issue.  (*Id.* at 13–14).

416.945(b), namely Lombardozzi's physical ability to sit, stand, walk, lift, carry, push, or pull. But there was no medical evidence in the record that Lombardozzi had such difficulties, apart from evidence about his balance issues, dizziness, blurred vision, and floating sensation, which the ALJ did address.  (ECF No. 8 at 23–24).  The ALJ did not analyze the mental functions described in 20 C.F.R. §§ 404.1545(c), 416.945(c), such as Lombardozzi's ability to understand, remember, carry out instructions, and respond to supervision.  But there was no medical evidence that Lombardozzi had such difficulties separate from his hearing issues, which the ALJ did address.  (ECF No. 8 at 24–26).  And, as already noted, the ALJ did address the relevant impairment described in 20 C.F.R. §§ 404.1545(d), 416.945(d), namely, Lombardozzi's hearing difficulties.  (ECF No. 8 at 24–26).  Thus, the ALJ addressed all of Lombardozzi's *relevant* limitations under 20 C.F.R. §§ 404.1545(b)–(d), 416.945(b)–(d).  As a result, the ALJ did not commit legal error by failing to conduct a function-by-function analysis.

**B.     The ALJ Appropriately Found That There Were Jobs in Significant Number in the National Economy that Lombardozzi Could Perform**

Lombardozzi makes two arguments that challenge the ALJ's finding that there were jobs in significant number in the national economy that Lombardozzi could perform (in step five).  First, Lombardozzi argues that he would be unable to perform any of the jobs identified by the vocational expert, given his hearing limitations.  (ECF No. 10 at 11–12).  Second, Lombardozzi argues that the ALJ posed inadequate hypothetical questions to the vocational expert, which did not fully reflect all of Lombardozzi's limitations.  (*Id.* at 15).  As explained below, neither argument warrants remand.

1.     The Vocational Expert and ALJ Sufficiently Identified Jobs in Significant Number in the National Economy that Lombardozzi Could Perform

Lombardozzi argues that he could not perform the jobs of a hand packager, laundry

laborer, or a cook's helper, which were identified by the vocational expert and adopted by the ALJ in his step five determination.  (*Id.* at 11–12).  He first argues that he cannot perform the job of a hand packager, which "requires a loud noise environment" that is precluded by his "severe hearing impairment" and the "moderate sound/noise level" limitation set by the ALJ.  (*Id.* at 11–13).  He next argues that the job of a laundry laborer and cook's helper are also inappropriate because his "marked limitations in both ears," and "severe hearing loss and no cochlear implantation," would make it difficult for him to hear instructions or hear what is going on around him.  (*Id.* at 12).  These arguments fail for at least two reasons.

First, Lombardozzi's arguments largely rest on his assertion that he cannot perform the identified jobs due to his "severe hearing impairment" and "marked limitations in both ears." (*Id.* at 11-12).  But this ignores the ALJ's RFC determination that Lombardozzi had "moderate" hearing loss and was "limited to a *moderate* sound/noise level" work environment. (ECF No. 8 at 23 (emphasis added)).  As explained above, that determination was supported by substantial evidence.  And Lombardozzi offers no evidence (beyond speculation) to suggest that someone with moderate hearing loss could not perform the identified jobs.

Second, that the job of a hand packager "requires a loud noise environment" (ECF No. 10 at 11), does not warrant remand.  Lombardozzi correctly notes that the noise level for the occupation of hand packager is "level 4 – loud," *see Hand Packager*, DICTIONARY OF OCCUPATIONAL TITLES, Code 920.587-018, 1991 WL 687916 (4th ed. 1991), which exceeds the "moderate sound/noise level" limitation set by the ALJ (ECF No. 8 at 23).  But the same is not true for the other two identified jobs of laundry laborer and cook's helper, which only require a "level 3—moderate" noise level.  *See Wet Wash Assembler*, DICTIONARY OF OCCUPATION TITLES, Code 361.687-010, 1991 WL 672990 (4th ed. 1991); *Cook Helper*, DICTIONARY OF

OCCUPATION TITLES, Code 317.687-010, 1991 WL 672752 (4th ed. 1991).  Based on the

vocational expert's testimony, there are an estimated 15,000 to 16,000 laundry laborer jobs, and

an estimated 19,000 to 20,000 cook's helper jobs in the national economy.  (ECF No. 8 at 61–

62).  Each of these numbers is enough to satisfy the Commissioner's burden at step five.[38]

The ALJ thus did not err by relying on the vocational expert's testimony and by

determining that there were jobs in significant number in the national economy that Lombardozzi

could perform.

2.  The ALJ's Hypothetical Questioning to the Vocational Expert Was Adequate

Lombardozzi also argues that the ALJ's hypothetical questions to the vocational expert

were inadequate because they "did not reflect all of [Lombardozzi's] limitations."  (ECF No. 10

at 15).  Lombardozzi fails to identify which "limitations" the ALJ's hypothetical questioning did

not reflect.  (*Id.*).  Regardless, the Court concludes that remand is unwarranted because the ALJ's

questioning was adequate.

At the step-five determination that there are significant numbers of jobs existing in the

national economy that a claimant can perform, "[a]n ALJ may make th[at] determination either

by applying the Medical Vocational Guidelines or by adducing testimony of a vocational

expert."  *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014).  "An ALJ may rely on a

vocational expert's testimony regarding a hypothetical as long as there is substantial record

evidence to support the assumptions upon which the vocational expert based his opinion, and

---

[38] Under 20 C.F.R. § 404.1566(b), "[w]ork exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which [the claimant is] able to meet with [their] physical or mental abilities and vocational qualifications."  Courts in this district "have generally found that what constitutes a 'significant number' is fairly minimal."  *Maldonado v. Comm'r of Soc. Sec.*, No. 21-cv-7594, 2023 WL 243617, at *10 (S.D.N.Y. Jan. 18, 2023).  District courts in this Circuit "have found varying nationwide numbers upwards of 9,000 jobs sufficient to meet the significant number requirement."  *Id.* (collecting cases where district courts have held that 12,000 jobs, 9,996 jobs, 11,442 jobs, and 9,046 jobs were deemed significant).  Here, the vocational expert's testimony of 15,000 to 16,000 laundry laborer jobs and 19,000 to 20,000 cook's helper jobs are, in the aggregate and individually, sufficient to be deemed significant.

accurately reflect the limitations and capabilities of the claimant involved."  *Id.* (alteration, citation, and internal quotation marks omitted).

Here, the ALJ asked the vocational expert "to assume a person of the claimant's age, education, and work experience without exertional limitations," but the person "should avoid concentrated exposure to atmospheric conditions, unprotected heights, and hazardous machinery."  (ECF No. 8 at 61).  This hypothetical reflected the same limitations the ALJ assessed in the RFC determination (*id.* at 23), which was supported by substantial evidence (*see* Section IV.A.2 above).  As noted by the Second Circuit, "[w]hen the hypothetical posed to the vocational expert is based on a residual functional capacity finding that is supported by substantial evidence, the hypothetical is proper and the ALJ is entitled to rely on the vocational expert's testimony."  *Snyder v. Colvin*, 667 F. App'x 319, 321 (2d Cir. 2016) (Summary Order) (citing *Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983)).  Thus, the ALJ's hypothetical questioning was proper and not a basis for remand.  Insofar as Lombardozzi argues that the ALJ should have assessed greater limitations, as explained above, that RFC determination was supported by substantial evidence.

## V.   CONCLUSION

For the reasons above, the Commissioner's motion is **GRANTED** and Lombardozzi's motion is **DENIED**.  The Clerk of Court is directed to terminate the pending motions, ECF Nos. 9, 10, 14, 15, 16 and to close this case.

**SO ORDERED.**

DATED:       White Plains, New York
             March 14, 2024

VICTORIA REZNIK
United States Magistrate Judge